Vickie L. Driver
Texas Bar No. 24026886
Christina W. Stephenson
Texas Bar No. 24049535
**HUSCH BLACKWELL LLP**
2001 Ross Avenue, Suite 2000
Dallas, Texas 75201
Phone: (214) 999-6100
Fax: (214) 999-6170
Email: vickie.driver@huschblackwell.com
Email: crissie.stephenson@huschblackwell.com

**PROPOSED COUNSEL FOR THE DEBTORS**

### UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | **CHAPTER 11** |
| | § | |
| **FOUNDATION HEALTHCARE, INC.,** | § | **CASE NO. 17-42571** |
| | § | |
| DEBTOR. | § | **Complex Case** |
| | § | **Designation Requested** |

----------------------------------------------------------

| | | |
|---|---|---|
| | § | |
| IN RE: | § | **CHAPTER 11** |
| | § | |
| **UNIVERSITY GENERAL HOSPITAL, LLC,** | § | **CASE NO. 17-42570-11** |
| | § | |
| DEBTOR. | § | **Complex Case** |
| | § | **Designation Requested** |

----------------------------------------------------------

### AFFIDAVIT OF MICHAEL S. MILLER
### IN SUPPORT OF THE DEBTORS' CHAPTER 11
### PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF

MICHAEL S. MILLER hereby declares, under penalty of perjury, as follows:

1.     I am the chief restructuring officer ("CRO") of Foundation Healthcare, Inc.

("FHI") and University General Hospital, LLC ("UGH"), Chapter 11 debtors and debtors-in-

possession (collectively, the "Debtors"), and based upon my involvement with the Debtors as

CRO effective January 30, 2017, I am familiar with the business and financial affairs of the

Debtors. I set forth the following in support of the Debtors' Chapter 11 petitions and requests for relief filed contemporaneously herewith.

## I.
## INTRODUCTION

2.      I am a Managing Director at Ankura Consulting Group, LLC ("Ankura") in Dallas, Texas.  I have more than 30 years of experience in health care management including hospitals, long-term acute care hospitals ("LTAC"), skilled nursing, rehabilitative units, psychiatric units, ambulatory care clinics, and durable medical care.  My experience includes acting as chief executive officer ("CEO"), chief operating officer ("COO"), and chief financial officer ("CFO") at corporate, regional and local levels.  I have also been appointed as the chief restructuring officer ("CRO") for Forest Park Medical Center at Frisco, LLC.  I have experience assisting distressed businesses attain a position of strategic, operational, and financial stability.

3.      Prior to joining Ankura, I was a Senior Manager at Deloitte where I was a member of the health care corporate restructuring industry practice. Prior to entering the corporate restructuring field, I served in positions such as Vice President of Group Operations for Community Health Systems, CEO of two acute-care hospitals for IASIS Healthcare, CEO of a three-hospital market for Columbia, HCA and CFO of a hospital in Texas.

4.      I earned a BS in Economics from the University of Texas at Arlington and a MBA in Management from the University of Dallas.

5.      On June 21, 2017 (the "Petition Date"), the Debtors commenced their Chapter 11 cases (the "Cases") by filing voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of Texas.  Though UGH is no longer operating as a hospital and FHI is no longer

providing support services to its affiliates, the Debtors continue to manage their businesses as debtors in possession pursuant to Bankruptcy Code Sections 1107 and 1108.

6.     To minimize any degradation to the value of their assets as a result of the commencement of the Cases, the Debtors request, contemporaneously herewith, various types of relief in certain "First-Day" applications and motions (collectively, the "First-Day Motions") filed herewith.

7.     The First-Day Motions focus on: (a) seeking to jointly administer the two Chapter 11 cases to allow for the efficient and convenient administration of these related Cases; (b) obtaining authorization for the limited use of cash collateral and debtor-in-possession ("DIP") financing as necessary for the continued wind-down and liquidation of the Debtors, as well as; (c) interim approval of my appointment as independent chief restructuring officer in these proceedings and Ankura as the Debtors' financial advisor; (d) allowing for the payment of amounts needed to satisfy medical insurance benefits owed to the individuals who worked for either of the Debtors prior to the Petition Date; (e) maintenance of pre-petition cash management systems needed to prevent disruption of critical payments from insurers and governmental entities; (f) approval of the employment of Donlin, Recano & Company, Inc., as claims, noticing and solicitation agent for the Debtors; and (g) a motion to ensure proper patient privacy in connection with the various filings and disclosures required by the Bankruptcy Code and associated rules.

8.     Without access to the funds provided for in the proposed cash collateral and DIP budget, the Debtors will be unable to continue with the orderly wind-down and liquidation process, including the Debtors' proposed joint liquidating plan, which seeks to appoint a liquidating trustee to administer various assets to creditors as appropriate through a liquidating

trust. Further, a chief restructuring officer and financial advisors are crucial to the Debtors' efforts in these cases, providing highly specialized healthcare wind-down services to the Debtors' remaining management. In addition, payment of medical insurance benefits for the employees who worked for the Debtors and paid premiums to receive such coverage is imperative, and a priority to the Debtors. Additionally, the Debtors seek relief to continue the use of their current cash management system in order to avoid an interruption in the flow of revenues from insurance reimbursements and patient payments. The Debtors also seek to employ a claims and noticing agent to, among other things, assist with service of pleadings, maintain the claims register, and maintain a call center to efficiently provide information to former patients who have questions about the filings. Finally, certain relief is needed to honor patient privacy while also filing the appropriate disclosures and providing notice to all applicable notice parties.

9. In addition to the personal knowledge that I have acquired while working with the Debtors, I also have basic knowledge of, and familiarity with the Debtors' business and financial affairs. I have also participated in negotiations with the Debtors' secured lenders, vendors, and others, and worked closely with the Debtors' personnel who handle business operations and financial management, as well as with the Debtors' outside counsel and other advisors. Except as otherwise indicated, all statements in this Affidavit are based upon my personal knowledge, my review of the Debtors' books and records, and other relevant documents, and other information prepared or collected by the Hospital's employees, or upon my opinion based upon my experience with the Debtors' business operations, financial condition, and the Hospital. In making the statements herein, based upon the foregoing, I have

relied in part upon others to accurately record, prepare, and collect any such documentation and other information.

10. I submit this Affidavit in support of the Debtors' petitions and First-Day Motions. As the Chief Restructuring Officer of the Debtors, I am authorized to submit this Affidavit on behalf of the Debtors.

11. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge and review of documents, or upon my professional opinion.

12. Part II of this Affidavit describes in more detail the Debtors' businesses, the developments which led to the Debtors' Chapter 11 filings and our goals in these Cases. Part III sets forth facts relevant to consideration of the First-Day Motions.

## II.
## THE DEBTORS' HISTORY

### A.    Overview of the Debtors

13. FHI was originally incorporated in Oklahoma on August 18, 2003 under the name "Graymark Productions, Inc." and later changed its name to "Graymark Healthcare, Inc." on December 31, 2007, and then changed its name to its current name, Foundation Healthcare, Inc., on December 2, 2013.

14. FHI, a publicly traded Oklahoma corporation, was in the business of owning and managing facilities which operated in the surgical segment of the healthcare industry. At the peak of its operations, FHI owned and/or managed five (5) surgical hospitals, nine (9) ambulatory surgical centers, and three (3) outpatient departments in six (6) states in the Southeastern United States. The facilities provided care for patients seeking general surgeries and specialty surgeries such as orthopedics, neurosurgery, pain management, podiatry,

gynecology, optometry, gastroenterology, pediatric ENT, wound care, sleep management, radiology, imaging, and other ancillary services.  FHI did not have any direct hospital operations or patients; however, FHI provided leadership, management, central back office, and organization services to many of its related affiliates, including UGH.

15.     As of June 30, 2016, FHI had extensive accumulated and working capital deficits.  As a result, FHI disclosed in its required SEC filings that it may not be able to meets its obligations as they come due over the next year.  At the time, FHI indicated that it planned to meet the projected cash flow shortage from the sale of certain assets and projected increases in revenues and decreases in expenses. Because of these uncertainties, FHI issued a "going concern statement," specifically that: "[w]e will require significant amounts of additional financing to execute our business plan and fund our other liquidity needs.  If our operating results do not meet or exceed our projections, we may be unable to continue operations and could be forced to substantially curtail operations or cease operations all together."

16.     FHI was unable to address the cash flow shortage either through the sale of assets, increase in revenues, decrease in expenses, or by reaching additional modifications or extension agreements with the Senior Lenders.  FHI was publicly traded under the symbol FDNH.  On February 3, 2017, FHI filed Form 15 Certification and Notice of Termination of Registration with the United States Securities and Exchange Commission to voluntarily deregister its common stock.  FHI has ceased to conduct business operations and has no employees.  FHI currently only has a contracted interim Chief Financial Officer and a contracted Chief Restructuring Officer, and one part time assistant.

17.     Foundation Surgical Hospital Holdings, LLC ("FSHH"), a third-tier subsidiary of FHI, purchased all the partnership interests in University General Hospital, LP and

substantially all the assets used in the Hospital's business through the bankruptcy of University General Health System, Inc. ("UGHS") in the United States Bankruptcy Court for the Southern District of Texas. The sale closed on December 31, 2015.

18. Just prior to the purchase, Foundation Surgical Hospital Affiliates, LLC ("FSHA"), a second-tier subsidiary of FHI, formed Foundation Hospital General of Houston, LLC ("FHGH") to acquire the general partnership interests in University General Hospital, LP. On or about January 25, 2016, University General Hospital, LP converted to a Texas limited liability company, University Hospital General, LLC, one of the Debtors herein.

19. UGH is 11% owned by seven (7) doctors or doctor-owned entities, each owning different numbers of membership units in Class A, one of two classes. Prior to the Petition Date, the majority of the Class A and Class B membership units comprising a total 88.99% ownership interest in UGH were transferred by FSHH to FSHA. The remaining 0.01% ownership interest holder and Class B member of UGH is FHGH.

20. UGH, which did business as Foundation Surgical Hospital of Houston, was a surgically focused, 69-bed hospital located in the Texas Medical Center at 7501 Fannin Street in Houston, Texas (the "Hospital"). The Hospital opened under prior ownership/management in 2006. Prior to its closure in January 2017, UGH offered a full array of equipment and services including inpatient and outpatient medical treatments and surgeries, six state-of-the-art operating suites, two cardiac catheterization labs, an endoscopy suite, pulmonary medicine, diagnostic imaging, laboratory, wound care and hyperbarics, as well as other ancillary services. During operation, the Hospital's medical services included bariatric, orthopedic, neuro/spine, and general surgery, as well as gynecology, interventional cardiology, podiatry and interventional pain management.

21.     After the purchase, when UGH attempted to re-syndicate the Hospital and attract new physician partners, there was little or no interest in the market due to the existence of other high profile struggling or failing physician-owned hospital systems. Because UGH was unable to attract physician partners with the types of surgical cases that would provide higher insurance reimbursement rates, operational income also failed to meet expectations. Furthermore, UGH could not access favorable managed care contracts as a sole provider in the Houston area because it was unaffiliated with any of the larger hospital systems. FSHH had to supplement UGH's cash flow to maintain operations.

22.     Moreover, in September 2016, UGH voluntarily suspended its laboratory license/certification due to the inability to fund adequate supplies and the results of a state and federal investigation finding multiple irregularities. Because UGH could not run its lab in-house, UGH had to contract with Methodist Pathology Associates, PLLC for laboratory services at 2-3 times the in-house cost, resulting in even higher expenses for the struggling hospital. This led to an aggressive buildup of payables over the year and UGH's inability to timely pay certain critical vendors.

23.     Finally, in November and December 2016, UGH also experienced an unusually high level of employee medical claims that were out of network, and given that UGH is self-insured and has a stop-loss of $125,000 per claimant per year, this aberrational expense hit UGH exceptionally hard.

24.     As of December 2016, the Hospital, located in the Texas Medical Center in Houston, Texas, had average daily census of 7.6 inpatients per day and a 3,182.3 average monthly number of outpatients. UGH's leased facility is comprised of over 113,000 useable square feet and is situated on approximately 0.94 acres. Until mid-January 2017, when the

Hospital began the process of closing its doors, UGH had approximately two hundred and fifty-two (252) non-insider clinical and non-clinical employees.

25.     Pre-petition, the Debtor's central billing office ("CBO") services were provided by Foundation Surgical Hospital Management, LLC ("FSHM") in accordance with that certain Management Agreement dated effective January 1, 2016 (the "Management Agreement") with FSHM.  In exchange for these services, the Debtors provided FSHM a management fee of 3% net monthly collected revenues. FSHM, FSHA, FHGH, and FSHH are wholly owned subsidiaries of FHI.  Attached hereto as **Exhibit A**, is an organizational chart illustrating the relevant relationships.

26.     As UGH did not generate sufficient revenue to operate the Hospital and to service its debt, UGH began exploring its business options.  To address exigent financial and operational issues, the Debtors retained Ankura Consulting Group ("Ankura") effective December 16, 2016, to assist the Debtors to, among other things, create short-term budgets, negotiate appropriate waivers and forbearances, and assess the Debtors' available assets and options by which to improve the Debtors' performance.  When a potential sale of the operating Hospital fell through, UGH did not have access to sufficient funds to continue to safely operate the Hospital and therefore had no choice but to close the Hospital.  UGH, with the help of Ankura Consulting Group, took every care to maintain patient safety and privacy while closing the Hospital in an orderly manner.

### B.     Financing History

27.     Pursuant to that certain Credit Agreement, dated as of December 31, 2015, (as has been or may be amended, supplemented, or restated from time to time, the "Credit Agreement"),

among FHI,[1] as borrower, Texas Capital Bank, National Association, as Administrative Agent (the "Prepetition Agent"), and the lenders from time to time party to the Credit Agreement (collectively, the "Prepetition Lenders"), the Prepetition Lenders made certain loans to FHI, which loans are evidenced by, without limitation, that certain Promissory Note dated as of December 31, 2015, executed by FHI and payable to the Prepetition Agent, for and on behalf of the Prepetition Lenders (as has been or may be amended, supplemented or restated from time to time, the "FHI Note"). Contemporaneously with the extension of the loans by the Prepetition Lenders to FHI under the Credit Agreement, FHI made a loan in the principal amount of $12,605,000.00 to UGH (the "Intercompany Loan"). The Intercompany Loan is evidenced by that certain Intercompany Promissory Note dated December 31, 2015 (the "Intercompany Note"). UGH's obligations to FHI under the Intercompany Note are secured by that certain Intercompany Security Agreement dated December 31, 2015 (the "Intercompany Security Agreement" and, together with the Intercompany Note and all related documents, agreements, notes, and financing statements, collectively, the "Intercompany Indebtedness Documents"), pursuant to which UGH granted FHI a security interest encumbering substantially all of UGH's assets. FHI's obligations to the Prepetition Agent and Prepetition Lenders under the Credit Agreement and FHI Note were secured by, among other things, a pledge of FHI's interest in the Intercompany Indebtedness Documents. Additionally, FHI assigned the Intercompany Note to the Prepetition Agent on December 31, 2015. The Credit Agreement, FHI Note, and related security agreements, deeds of trust, and other agreements and documents executed in connection with the Credit Agreement, together with any amendments and restatements thereto, are collectively referred to herein as the "FHI Indebtedness Documents."

---

[1] FHI, through certain of its subsidiaries, is the indirect owner of approximately 90% of the membership interests of UGH.

28. As of the Petition Date, the Prepetition Agent asserts that the aggregate amount of not less than $6,284,895.28 was due and owing by FHI to the Prepetition Lenders under the FHI Indebtedness Documents (the "FHI Prepetition Indebtedness"). As of the Petition Date, the Prepetition Agent asserts that the aggregate amount of not less than approximately $7,622,000.00 was due and owing by UGH to the Prepetition Lenders under the Intercompany Indebtedness Documents, (the "UGH Prepetition Indebtedness" and, collectively with the FHI Prepetition Indebtedness, the "Prepetition Indebtedness").

29. On December 30 2016, TCB, as administrative agent, issued letters to FHI and UGH stating that due to certain events of default by FHI under its Credit Agreement with TCB, TCB directed all payments under the Intercompany Note to be made to TCB and not FHI pursuant to those documents.

30. The Debtors believe that the Prepetition Lenders are the Debtors' only secured lenders, with other financing relationships for equipment characterized as capital leases. The Debtors are party to those certain equipment lease agreements with First Financial Corporate Leasing, LLC, Med One Capital Funding, LLC, and Toshiba American Medical Credit, a program of Toshiba America Medical Systems, Inc. whereby the Debtors leased certain medical equipment (the "Equipment Leases"). As of the Petition Date, UGH owes an aggregate of approximately $2,359,859.04 and FHI owes an aggregate of approximately $80,000.00 under the Equipment Leases.

## C. <u>Real Property Leases</u>

31. FHI leases corporate office space located at 13900 N. Portland, Oklahoma City, Oklahoma 73134 from Memorial Hefner Parkway, LLC, an Oklahoma limited liability company ("Memorial") pursuant to that certain *Office Lease Agreement* dated January 18, 2016 (the "FHI

Lease"). The FHI Lease's initial term was a period of sixty-three (63) months commencing on May 1, 2016. The FHI Lease included a $40,000.00 security deposit, and increasing monthly base rent ranging from $40,037.09 to $42,201.25. FHI is also responsible for certain additional costs for items such as insurance, taxes, and landscape services. The FHI Lease is current as of the Petition Date.

32.     UGH leases the real property and fixtures on which the Hospital operates from Cambridge Properties ("Cambridge") pursuant to the terms of that certain *Lease Agreement* dated July 21, 2005, as thereafter amended (the "UGH Lease"). The UGH Lease's initial term was extended through July 20, 2026, with a monthly rent payment in the amount of $227,269 for the Hospital and the Special Use Common Areas plus approximately $100 per month for the Compactor Area and $25,575 per month for 165 Garage Parking Spaces.

33.     As of the Petition Date, UGH's payments due under the Lease for approximately five (5) months' base rent, special use common areas, projected general operating expenses, water, night time security, garage parking, valet spaces, reserved parking, and basement parking in the amount of $1,629,000.00 has not been paid.

**D.     The Debtors' Intentions in Chapter 11**

34.     In Chapter 11, the Debtors have an opportunity to quickly file and confirm a joint plan of liquidation, allowing a liquidating trustee to administer the assets of the estates and achieve maximum values for all creditors, and further oversee the orderly wind-down and dissolution of these healthcare entities to ensure patient rights and records are handled in accordance with applicable law.

35.     The Debtors file these Cases seeking cash collateral usage for 2 weeks on an interim basis, as well as approval of a DIP financing package to provide the necessary funding

for the remainder of Cases, projected to be 12 weeks.  During this time, the Debtors intend to file and aggressively seek confirmation of a joint plan of liquidation as quickly as possible to reduce costs while still providing adequate notice to the appropriate parties of all relief sought and complying with relevant provisions of the Bankruptcy Code.  All indications show that this is a reasonable probability and the Debtors intend to file pleadings seeking such approval and authorization with the support of the Prepetition Lenders.  In order to maximize values for all creditors, including unsecured creditors, the Debtors were forced to commence these Cases now and respectfully seek the relief set forth in the First-Day Motions summarized below.

**III.**
**FIRST-DAY MOTIONS**

36.     Generally, the First-Day Motions have been designed to meet the goals of: (a) wind down the Debtors' operations during the Cases while preserving as much value to the estate as possible; (b) maintaining patient privacy and confidentiality, (c) employing a chief restructuring officer to manage the Debtors through this bankruptcy process, and (d) hiring a claims and noticing agent to facilitate noticing and handling of claims during the bankruptcy process.

37.     I have reviewed each of the First-Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First-Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful outcome in these Cases.

38.     The First-Day Motions are identified and more fully described below.

**A.     Debtors' Motion Pursuant to Rule 1015 of the Federal Rules
         of Bankruptcy Procedure for Entry of an Order Directing
         Joint Administration of Chapter 11 Cases**

39.     UGH is an affiliate of FHI because FHI indirectly owns and/or controls at least 20% of the outstanding voting shares of UGH.  FSHA is the majority interest holder of UGH equity and FSHA is 100% owned by TSH Acquisition, LLC, which is majority owned by FHI.

40.     Joint administration of UGH and FHI's cases is warranted by the fact that the financial affairs and business operations of the two entities are closely related, as well as the fact that they are purportedly cross-collateralized and cross-defaulted under terms of the Note and Credit Agreement.

41.     Additionally, entry of an order directing joint administration of these cases will obviate the need for duplicative notices, applications and orders, and will thereby save considerable time and expense for each debtor and result in substantial savings to their respective estates.

42.     Furthermore, the rights of the respective creditors of the Debtors will not be adversely affected by joint administration of these cases because the Joint Administration Motion requests only administrative consolidation of the estates, and the Debtors are not seeking substantive consolidation.  Each creditor must file a claim against a particular Debtor's estate. Thus, the rights of all creditors will be enhanced by the reduced costs resulting from joint administration.  This Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files.  Finally, supervision of the administrative aspects of these Cases by the Office of the United States Trustee will be simplified.

**B.      Debtors' Application for an Entry of an Interim and Final Order
         Authorizing the Employment, Retention, and Designation of
         Michael S. Miller as Chief Restructuring Officer and
         <u>Ankura Consulting Group, LLC as Financial and Restructuring Advisor</u>**

43.     I seek to serve as the CRO for the Debtors to guide them through the bankruptcy and liquidation process; and to provide an experienced, independent perspective to the Debtors and its financial and operational needs.  In this capacity, I plan to assess the Debtors' needs holistically, with no agenda but maximizing value for creditors while maintaining patient privacy.  I can independently request and review information, evaluate the same, and diagnose any problems from which the Debtors suffer.  I can then use that information to work with counsel and other professionals to provide as orderly and organized a liquidation process as possible.

44.     Ankura provides financial and restructuring consulting services to various constituencies of underperforming and distressed companies.  Ankura has extensive experience and its professionals have led or held key roles in the turnaround and/or restructuring of hundreds of some of the most complex matters around the globe and across a broad range of industries.  The Debtors have determined that the services of an experienced restructuring and financial advisor will substantially enhance their attempts to maximize the value of their assets in bankruptcy.  The Debtors believe that Ankura's experience, which includes experience in the healthcare industry, is important in its efforts to maximize value for creditors.

45.     Ankura can provide the Debtors with the resources, capabilities and experience that are important to the Debtors' efforts to wind-down the businesses. Ankura's experienced staff and professionals are well-qualified and able to advise the Debtors in a timely and efficient manner.

46.     To the best of my knowledge and except to the extent disclosed in the *Affidavit of Michael S. Miller in Support of the Application for Entry of an Order Authorizing the Employment, Retention and Designation of Michael S. Miller as Chief Restructuring Officer and*

*Ankura Consulting Group, LLC as Financial and Restructuring Advisor*, filed contemporaneously herewith: (a) neither I nor Ankura have any connection with the Debtors, their creditors, or other parties in interest, or the attorneys or accountants of the foregoing, or the Office of the United States Trustee for the Northern District of Texas (the "U.S. Trustee") or any person employed in the Office of the U.S. Trustee; and (b) neither I nor Ankura hold any interest adverse to the Debtors' estates.

**C.    Debtors' Motion Pursuant to Sections 105(a), 345(b), 363(c)
and 364(a) of the Bankruptcy Code for Authorization to
(I) Continue to Use the Existing Cash Management System,
(II) Maintain Existing Bank Accounts, and (III) Waive Certain Deposit Guidelines**

47.    To efficiently and seamlessly manage their businesses, the Debtors utilize a cash management system (the "Cash Management System") to collect and transfer the funds generated from the collection of accounts receivable of UGH at the Hospital, depositing the collections in one of three deposit accounts and transferring funds to a central operating and down to two disbursing accounts from which UGH's financial obligations, including payroll and accounts payable, are paid.    The Cash Management System facilitates the Debtors' cash monitoring, forecasting and reporting, and enables the Debtors to maintain control over the administration of their bank accounts.    A list of the Debtors' accounts and chart showing the flow of the Debtors' Cash Management System is attached hereto as **Exhibit B**.[2]

48.    Pre-petition, UGH's receipts, including but not limited to electronic funds transfers from insurance companies, Medicare, credit card companies, local deposits and CBO patient payments, were deposited into one of three deposit accounts.    Electronic payments from Blue Cross Blue Shield and CBO patient payments were deposited directly into a lockbox

---

[2] Complete account numbers have been redacted due to confidentiality concerns, leaving only the last four digits for reference.

account in UGH's name at TCB (the "Lockbox Account"), and then automatically swept to an operating account also located at TCB (the "Main Operating Account"). Local deposits and co-pays were deposited into a local deposit account at Chase Bank, N.A. (the "Local Deposit Account") in UGH's name before being transferred to the Main Operating Account. The Local Deposit Account will be closed as soon as practicable. Payments from Medicare and all other third party payors were sent directly to another lockbox deposit account in UGH's name at AmegyBank (the "Medicare Deposit Account") before being transferred to the Main Operating Account.

49.     Pre-petition, FHI utilized a bank account at TCB, mostly for funding corporate expenses (the "FHI Operating Account"). Funds were also transferred from the FHI Operating Account to another account at Valliance Bank for the payment of employee health insurance claims (the "UMR Account"). There are also two corporate accounts at BankSNB, which management kept open so that FHI would have access to local banking. The BankSNB accounts have only been used recently for an auto-draft by Wells Fargo for payments on a financed corporate copy machine, which payments will be stopped as of the Petition Date and the BankSNB accounts closed. Operating payments for FHI have been funded through the FHI AP Account at TCB. Exhibit B demonstrates the flow of funds for the Cash Management System of both Debtors.

50.     As a practical matter, many of the payments made directly to the deposit accounts are from third party payors and, being insurance companies and governmental entities, changing that information can be time consuming and difficult, resulting in delayed payments to both Debtors. Some of the insurance payors have indicated it could take four (4) to eight (8) weeks for any changes in electronic deposit information to be implemented.

51.     Accordingly, the Debtors are seeking authority to (i) continue to operate the Cash Management System, (ii) maintain certain of the Debtors' existing Bank Accounts and (iii) a waiver of Section 345(b) of the Bankruptcy Code as necessary.

52.     The Cash Management System constitutes an ordinary course and essential business practice providing significant benefits to the Debtors, including, among other things, the ability to ensure the maximum availability of funds when and where necessary, and to reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.

53.     The existing Cash Management System is the most effective mechanism for managing receipts at this time.  Thus, the Debtors believe that "cause" exists pursuant to Section 345(b) of the Bankruptcy Court to waive such requirement.  The Debtors also believe that the benefit of waiving the Section 345(b) requirement far outweighs any harm to the estates.  Thus, the Debtors believe that maintenance of the existing Cash Management System as set forth herein is in the best interests of the estates and all parties in interest. Accordingly, the Debtors seek authority to maintain and use their existing Cash Management System during the Cases.

**D.      Motion of Debtors to (I) Authorize Certain Procedures to Maintain the Confidentiality of Patient Information, (II) for Authority to File Under Seal Separate Matrix and Schedule F Containing Patient Information, and (III) for <u>Relief from Required Form of Mailing Matrix with Regard to Separate Matrix</u>**

54.     Certain past patients of UGH may assert claims against UGH, and under the Bankruptcy Code and the applicable Bankruptcy Rules, UGH is required to list information about such patients as potential creditors, including their names and addresses, in the creditor matrix and in the Schedules and Statements. Listing any patient names or addresses in the matrix, Schedules, and Statement, or any notice or certificate of service, however, may violate

the Health Insurance Portability and Accountability Act ("HIPAA"), unless an exception permitting such distribution is satisfied.

55.     Furthermore, FHI has access to or control over certain healthcare related and private financial information of past patients that may also qualify for protection under the HIPAA.   Therefore, out of an abundance of caution, both the Debtors seek relief under this motion.

56.     An exception exists in HIPAA for disclosures made with valid authorization. Valid authorization for purposes of HIPAA includes information authorized to be released for law enforcement purposes, which is defined as releases required by law (including court orders, court-ordered warrants, and subpoenas) and administrative requests. See 45 C.F.R. § 164.512(f). To the extent that the Debtors distribute protected health information pursuant to an order of this Court, such distribution would not violate HIPAA.

57.     Likewise, the Texas Medical Records Privacy Act ("TMRPA") provides that a "covered entity" must comply with HIPAA and TMRPA. *See* TEX. HEALTH AND SAFETY CODE § 181.004. Section 181.001(2)(A) of TMRPA provides that the term "covered entity" includes a health care facility or clinic. Section 181.151 of TMRPA prohibits the "reidentification or attempt to reidentify an individual who is the subject of any protected health information without obtaining the individual's consent or authorization." TMRPA permits disclosure pursuant to a court order. See TEX. HEALTH & SAFETY CODE § 181.154(c)(2).

58.     To comply with applicable privacy restrictions, the Debtors propose to file the Supplemental Schedule F and a separate patient creditor matrix ("Patient Matrix") under seal. Because the privacy restrictions of HIPAA may still be imposed beyond final disposition of this

case, the Debtors further request that the Patient Matrix and Supplemental Schedule F be kept confidential indefinitely and not deemed unsealed 60 days after the final disposition of this Case.

59. The Debtors estimate that the Hospital treated over 34,000 patients in the last 3 years ("Patients").[3] The Patients will be given notice in writing in the form of the Notice of Commencement of this Bankruptcy Case and Proof of Claim form, as well as a communication informing the Patients how to request further notice of future pleadings and access to the claims agent's website. The proposed claims and noticing agent for this case will be Donlin, Recano & Company, Inc. The Debtors are requesting that no further notices and/or pleadings be required to be given to the Patients in this case unless any such Patient requests further notices and/or pleadings or such Patient timely files a proof of claim.

60. Accordingly, the Debtors request that the Court establish the following procedures to balance the need to protect patient health information with the need to disclose information regarding this case to the public:

(a) the Debtors shall omit any reference to current or former Patients from the publicly filed matrix of creditors and any certificate of service not filed under seal;

(b) the Debtors shall make an unredacted copy of the Schedules and Statements available to (a) the Court and to the United States Trustee upon request; and (b) any other party-in-interest only after this Court has entered an order, after notice and a hearing, authorizing the Debtors to do so;

(c) the Debtors shall maintain a list of all current or former Patients (the "Patient Matrix") that would appear on the matrix of creditors, and shall make the Patient Matrix, or any portion thereof, available to any party-in-interest only after this Court has entered an order, after notice and a hearing, authorizing the Debtors to do so;

---

[3] UGH was only operating and seeing patients for one year, and therefore patients treated under the prior ownership and management of the Hospital would not be creditors of UGH. Specifically, patients seen prior to the close of the Hospital sale on December 31, 2015, would not be creditors of the UGH estate. However, because the third party vendor hosting the medical records has denied UGH access to same, UGH currently only has access to the three year patient list, and is therefore noticing the entire list out of an abundance of caution.

(d)     when the Debtors serve any paper upon any person listed on the Patient Matrix, the Debtors shall note in the respective certificate of service that the parties served include persons listed on the Patient Matrix;

(e)     the Debtors shall file the Patient Matrix and any Supplemental Schedule F under seal;

(f)     the Debtors may give notice to Patients in the form of the Notice of Commencement of this Bankruptcy Case and Proof of Claim form, as well as a communication informing the Patients how to request further notice of future pleadings and access to the claims agent's website; and

(g)     the Debtors are relieved from submitting the lengthy Patient Matrix in the format required by the Local Rules.

61.     The requested relief is required to permit the Debtors to comply with HIPAA and TMRPA. In particular, TMRPA imposes civil penalties for violations. The Debtors believe that the procedures proposed herein permit them to comply with both HIPAA and TMRPA, as well as their disclosure requirements under the Bankruptcy Code and Bankruptcy Rules.

**E.      Motion for Interim and Final Orders (1) Authorizing Secured Post-Petition Financing; (2) Authorizing the Use of Cash Collateral; (3) Granting Security Interests, Superpriority Claims, and Other Adequate <u>Protection; (4) Modifying the Automatic Stay; and (5) Scheduling a Final Hearing</u>**

62.     The Debtors seek authority, on an interim basis, to pay reasonable and necessary wind-down expenses, including but not limited to, employee medical insurance benefits, costs for Patient record maintenance, data storage and removal, tax return preparation, and professional and contract employee fees as set forth on **Exhibit C** attached hereto.  A need exists for the Debtors to utilize cash collateral in order to continue to preserve and maintain the value of the Debtors' estates.

63.     The Debtors' proposed use of cash collateral is necessary to preserve the value of the Prepetition Lenders' collateral and the Debtors' estates for the benefit of all creditors.  The Prepetition Lenders have represented that they are willing to permit the Debtors to use cash

collateral only in the amounts, and on the conditions provided for, in the motion and in the proposed interim order. The Debtors believe that, under the circumstances, the terms and conditions set forth in the motion and in the proposed interim order are fair and reasonable for using cash collateral and granting adequate protection.

64.     Without the ability to fund the orderly wind-down expenses, the Debtors and their estates will suffer harm. For example, if funds are not available to maintain patient records, such records may be lost or destroyed in violation of federal and state law, to the detriment of the Debtors and the Patients.

65.     Prior to the Petition Date, the Debtors sought out several potential sources of debtor-in-possession ("DIP") financing. The Debtors are unable to obtain credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code or on any other terms. The Debtors engaged in good faith and arm's-length negotiations with the Prepetition Lenders.

66.     The DIP Financing requested by the Debtors is necessary to maintain the value of the Debtors' assets and effect an orderly wind-down of the Debtors' businesses. Without the proposed DIP Financing as negotiated, the complex disposition of the Debtors' assets will be frustrated and the Debtors' creditors exposed to an unwarranted loss in value of their collateral.

**F.      Debtors' Motion for an Order (A) Authorizing (I) the Debtors to Pay Pre-Petition Medical Insurance Benefits and (II) Banks to Honor and Pay Checks Issued to Pay Pre-petition Medical Insurance Benefits, and (B) Establishing a Deadline for the Submission and Administration of Medical Insurance Benefit Claims, and (C) <u>Authorizing the Termination of the Debtors' Administrative Services Agreement</u>**

67.     Prior to the Petition Date, FHI had one hundred and thirty-six (136) employees. These employees provided management and support services to FHI's affiliates. Prior to the Hospital's closure in January of 2017, UGH's workforce included a total of two hundred and fifty-two (252) non-insider clinical and non-clinical professionals and staff (collectively, with

FHI's former employees, the "Employees"). The Employees were, in large part, highly skilled medical professionals working full time, part time and PRN positions.

68. In addition to salary, in the ordinary course of business the Debtors also provided various benefit programs to their Employees including medical and prescription drug coverage, through the Foundation Healthcare, Inc. Group Benefit Plan, ERISA Plan #501 (the "Group Benefit Plan"). The Group Benefit Plan is administered by UMR, formerly United Medical Resources, under an Administrative Services Agreement, effective January 1, 2014, between FHI and UMR (the "ASA"). The Group Benefit Plan is self-funded by FHI. UMR is a third party plan administrator subsidiary of United Healthcare Services, Inc. providing administrative services for self-funded health insurance plans.

69. Under the Group Benefit Plan, Employees paid a portion of the premiums for the Group Benefit Plan and the Debtors paid the remaining portion of the premiums. The Group Benefit Plan included coverage for claims incurred during the Employee's term of employment. The Group Benefit Plan was terminated effective March 31, 2017 (the "Termination Date"). Accordingly, only medical services provided prior to the Termination Date (the "Pre-Petition Medical Insurance Benefits") are covered under the Group Benefit Plan. The Debtors' estimate that the remaining, unpaid claims covered by the Group Benefit Plan (the "Pre-Petition Medical Insurance Benefits") will not exceed $463,000.00 in the aggregate.

70. Under the Group Benefit Plan, Employees (or their third-party providers) were permitted to submit claims through the UMR system for one (1) year after the event giving rise to the claim. Upon termination of the Group Benefit Plan as a result of bankruptcy, Employees (or their third-party providers) are given a shorter seventy-five (75) day period to file claims.

FHI retains the right to amend the Group Benefit Plan to provide for a modified claim submission period.

71.     The Debtors anticipate that all of the Employee's Pre-Petition Medical Insurance Benefits that the Debtors seek to pay are less than the priority wage allowance of $12,850 under Section 507(a)(4) of the Bankruptcy Code per Employee. However, to the extent that any one claim exceeds the $12,850 priority cap, the Debtors propose to provide notice and a seven (7) day opportunity to object to the payment of any such claim.

72.     Concurrent herewith, the Debtors have filed a motion seeking approval to utilize cash collateral and authority to enter into debtor-in-possession financing (the "Cash Collateral/DIP Motion"). The Cash Collateral/DIP Motion proposes that all such cash collateral or DIP funds used will be according to a limited budget. Procedures for the funding of amounts to be used specifically to pay the Pre-Petition Wages Medical Insurance Benefits up to a specified limited and in accordance with set procedures are included within such budget. Accordingly, upon the approval of the Cash Collateral/DIP Motion, the Debtors will have sufficient funds to pay the amounts sought by this Motion.

73.     Because the amounts represented by Pre-Petition Medical Insurance Benefits are needed to enable the Employees to meet their own personal obligations, absent the relief requested herein, they will suffer undue hardship and, in many instances, serious financial difficulties. Moreover, the Employees partially paid for this coverage and would be unduly prejudiced by a failure of the Debtors to fund the plans as part of their compensation and benefits. Therefore, the Debtors respectfully request authority to pay the Pre-Petition Medical Insurance Benefits. Contemporaneously therewith, the Debtors are requesting that the order entered by the Court also authorize banks to honor and pay checks issued to pay Pre-Petition

Medical Insurance Benefits and establish procedures and a claim bar date for the submission of claims for Pre-Petition Medical Insurance Benefits.

**G.   Debtors' Application for an Order Appointing Donlin, Recano & Company, Inc. as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), <u>Effective as of the Petition Date</u>**

74.     The Debtors seek an order appointing Donlin, Recano & Company, Inc. ("DRC") as the claims and noticing agent to assume responsibility for the distribution of notices and maintenance, processing, and docketing of proofs of claim in these Cases. The Debtors anticipate that there will be thousands of parties to be noticed in these Cases.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors believe that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtors' estates and their creditors.

75.     DRC has acted as the claims and noticing agent in numerous cases.  By appointing DRC the claims and noticing agent in this Case, the distribution of notices and processing of claims will be expedited, and the clerk's office will be relieved of the administrative burden of processing what may be an overwhelming number of claims and provide the public, free of charge, with access to the claims register on a case-specific website maintained by DRC.   Additionally, DRC provides call center services, so that when Patients, creditors, or other interested parties receive notice of the Cases, their calls may be answered by competent professionals at a much lower cost than if Debtors' bankruptcy counsel were fielding all the communications.

76.     DRC agrees to maintain records of all services showing dates, categories of services, fees charged and expenses incurred, and to serve monthly invoices on the Debtors, the office of the United States Trustee, counsel for the Debtors, counsel for any official committee,

if any, monitoring the expenses of the Debtors and any party-in-interest who specifically requests service of the monthly invoices. The fees to be charged by DRC in these Cases are reasonable and ordinary for these type of Cases and the services to be performed.

77. DRC represents in the *Affidavit of Alexander Leventhal in Support of the Debtors' Application for an Order Appointing Donlin, Recano & Company, Inc. as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), Effective as of the Petition Date*, filed contemporaneously herewith, that DRC is a "disinterested person" as that term is defined in Bankruptcy Code § 101(14) with respect to the matters upon which it is to be engaged. Furthermore, DRC shall not employ any past or present Employee of the Debtors for work that involves the Cases. Therefore, the Debtors seek the requested employment of DRC as claims and noticing agent.

## IV.
## CONCLUSION

78. The primary purpose of the filing of these Cases is to maintain patient privacy and to prevent deterioration and to protect the value of the estates. In the interim, through the First-Day Motions described above, the Debtors seek to minimize certain adverse effects that these Cases might otherwise have on the Patients, Employees, and assets of the Debtors' estates, while honoring the spirit of the Chapter 11 process.

79. For the reasons described herein and in the First-Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in each of the First-Day Motions and respectfully request the Court to do so.

I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: June ⁄5, 2017

_____

Michael S. Miller,
Chief Restructuring Officer

STATE OF TEXAS

COUNTY OF DALLAS

The foregoing instrument was acknowledged before me this ⁄5ᵗʰ day of June 2017, by Michael S. Miller as Chief Restructuring Officer of the Debtors.

_____

Notary Public, State of Texas



GEORGIA KIMBROUGH
MY COMMISSION EXPIRES
August 13, 2018

**AFFIDAVIT OF MICHAEL S. MILLER**
**IN SUPPORT OF THE DEBTORS' CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF** – **Signature Page**